**FOR PUBLICATION**

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 24-13513

_____

MITCHELL MARBURY,

*Plaintiff-Appellant,*

*versus*

WARDEN III,
WARDEN II,
CAPT. CARLA GRAHAM,

*Defendants-Appellees,*

BEVERLY WARREN
C.O.,

*Defendant.*

_____

Appeal from the United States District Court
for the Northern District of Alabama
D.C. Docket No. 4:18-cv-00925-CLS-JHE

_____

Before NEWSOM, KIDD, and WILSON, Circuit Judges.

NEWSOM, Circuit Judge:

In the last few years, St. Clair Correctional Facility in Alabama has been the subject of a number of lawsuits in which inmates have alleged that the threat of prisoner-on-prisoner violence is so grave that it risks violating the Eighth Amendment. *See, e.g.*, *Boykins v. Dunn*, 696 F. Supp. 3d 1061, 1066, 1072 (N.D. Ala. 2023) (denying prison officials summary judgment where the record reflected that the facility suffered from "chronic understaffing, noncompliance with institutional policies, inadequate locks, cameras, and metal detectors, and minimal control over inmate movement," and prisoners readily accessed weapons by "fashion[ing] knives from the chain link fence, bed rails, Coke cans, medical splints, or any other piece of metal [they could] access"); *McCarley v. Dunn*, 722 F. Supp. 3d 1242, 1251–52 (N.D. Ala. 2024) (denying motion to dismiss where an inmate asserted that violence at the prison "far exceeded typical levels" at comparable facilities and cited "insufficient staffing and supervision; unauthorized inmate movement throughout the prison; and the proliferation of contraband weapons" (internal citations omitted)); *Wilson v. Dunn*, 618 F. Supp. 3d 1253, 1264 (N.D. Ala. 2022) (denying motion to dismiss where a prisoner alleged "widespread contraband weapons, understaffing, poor inmate supervision, and unrestricted prisoner movement among cell blocks . . . result[ing] in hundreds of violent incidents at St. Clair per year"). This case is another in that line.

St. Clair inmate Mitchell Marbury appeals the district court's grant of summary judgment in favor of Warden DeWayne Estes,

24-13513                Opinion of the Court                3

Warden Cedric Specks, and Captain Carla Graham on his claim that they were deliberately indifferent to his safety in violation of the Eighth Amendment. The district court held that Marbury had failed to show a genuine dispute of material fact as to whether he faced a "substantial risk of serious harm" in the prison. After careful consideration, and with the benefit of oral argument, we vacate the district court's decision and remand for further proceedings.

## I

We'll summarize the pertinent background in three parts. First, we'll describe an earlier deliberate-indifference case brought by Marbury, *Marbury v. Warden*, 936 F.3d 1227 (11th Cir. 2019) (per curiam) (*Marbury I*), which guides our analysis here. Next, we'll recount the specific factual allegations underlying this case. And finally, we'll describe the winding procedural history that led to this appeal.

## A

Our decision in *Marbury I* reiterated and formalized guidelines for analyzing an Eighth Amendment deliberate-indifference claim that is based not on a specific and identifiable threat but, rather, on the theory that a "generalized risk of violence" pervades a prison. 936 F.3d at 1235. That case, like this one, centered on Marbury's experience at St. Clair. *Id.* at 1231. In 2016, Marbury asked prison officials to transfer him from one dorm to another because he felt unsafe, but, by his account, they refused—and even

4                    Opinion of the Court                    24-13513

mocked—his requests.[1]  *Id.* at 1231–32.  Not long thereafter, Marbury was attacked and stabbed by another inmate.  *Id.* at 1232.

Proceeding pro se, Marbury brought a 42 U.S.C. § 1983 claim alleging that the prison's officials were "deliberately indifferent to a substantial risk to his safety."  *Id.* at 1231.  The district court granted summary judgment to the officials.  This Court affirmed on the ground that Marbury's evidence "regarding a general risk of inmate-on-inmate violence d[id] not rise to the level necessary to show deliberate indifference to a substantial risk of serious harm."  *Id.* at 1235.  We so held principally for two reasons.

First, we emphasized that Marbury's only allegation probative of a "generalized risk of violence" was "his statement that he personally witnessed fifteen inmate-on-inmate stabbings during his time at St. Clair."  *Id.* at 1234.  And importantly, we said, we lacked evidence that could "place Marbury's statement in context," such as "the total prison population," "the sections of the prison in which the attacks occurred," or the "period of time [during which]

---

[1] In response to one request, an officer allegedly responded, "You don't enjoy hanging out with the thugs, afraid you might get shanked!" and "I got the keys to the city baby, you locked in."  *Marbury I*, 936 F.3d at 1231 (citation modified).  In response to another, a captain allegedly responded, "[D]o you really think I'ma act upon your requests, after you've filed complaints and requests against me," started laughing, then told Marbury to get himself a "shank."  *Id.* at 1231–32.  And in response to a third, Warden Estes, who is also a defendant in this case, reportedly laughed at Marbury and told him to get a knife.  *Id.* at 1232.

these incidents occurred." *Id.* So far as we could tell, we said, Marbury observed "fifteen stabbings . . . over the course of 6 years, for a rate of 2.5 per year," which we deemed insufficient to establish the sort of generalized inmate-on-inmate violence that gives rise to the requisite substantial risk of serious harm. *Id.*

Second, we emphasized that Marbury hadn't—as successful generalized-risk-of-violence plaintiffs had—"pointed to specific features of [the] facility or its population rendering it particularly violent." *Id.* at 1235. Examples of such "specific features," we said, might include "pervasive staffing and logistical issues rendering prison officials unable to address near-constant violence, tensions between different subsets of a prison population, and unique risks posed by individual prisoners or groups of prisoners due to characteristics like mental illness." *Id.*

Accordingly, even though Marbury "faced some risk of assaults by fellow prisoners," we held that "some risk" was "insufficient." *Id.* at 1235. Because he hadn't either provided "context" for the incidents he observed or identified "specific features" making St. Clair particularly violent, his deliberate-indifference claim failed. *Id.* at 1234–35.

**B**

Marbury was transferred out of St. Clair sometime after he sustained the 2016 attack. But in 2017, he was temporarily reassigned to St. Clair. The events following his reassignment gave rise to this case. We recount those events in the light most favorable

to Marbury, as the nonmoving party at summary judgment below. *See Caldwell v. Warden*, 748 F.3d 1090, 1098 (11th Cir. 2014).

Having been attacked once already in 2016, Marbury again feared for his safety. *See Marbury I*, 936 F.3d at 1231–32. Accordingly, he asked three prison officials to place him in segregation—but to no avail. Marbury asked Warden Cedric Specks, who advised him that he should "obtain a knife or pay prison gang members to protect him." R&R, Aug. 12, 2024, at 5, Dkt. No. 87. He also asked Captain Carla Graham, who dismissed his concerns because "the guy who stabbed [him] had been transferred" to a different prison. *Id*. at 5–6. And he mailed a written request to Warden DeWayne Estes, who said he never received it. *Id*. at 6.

Denied the requested transfer, Marbury stayed in the general prison population, where he alleges he saw several stabbings, including one incident in which a supervisor confiscated a knife from an inmate who was fighting with another prisoner, only to give it back. *Id*. Marbury also claims that inmates occupied cells to which they weren't assigned. *Id*. And he says he felt unsafe in the L/M Block, in which he was housed, "due to a lack of security and 'hostile living condition[s],'" *id*., and because guards were absent from the block for hours at a time, *see* Am. Compl. at 11, Dkt. No. 9. Marbury claims that he reported these incidents and conditions to prison staff.

Marbury's fears turned out to be well-founded. On the morning of January 9, 2018, an inmate entered his cell and hit him on the head with a 20-pound dumbbell, knocking him unconscious.

24-13513                Opinion of the Court                7

Marbury sustained serious injuries, was transported to the emergency room, and remained hospitalized for three days.

### C

Just as Marbury had sued after the stabbing incident in 2016, he brought this case following the attack he sustained in 2018. Once again proceeding pro se, he filed a § 1983 action against Warden Estes, Warden Specks, and Captain Graham (together, the "Prison Officials") in their individual capacities for violations of the Eighth Amendment. He later filed an amended complaint clarifying that he sought monetary, injunctive, and declaratory relief.

The magistrate judge recommended dismissal of all Marbury's claims except his Eighth Amendment claim based on the theory that a generalized risk of violence pervaded St. Clair. The district court accepted the magistrate judge's recommendation.

The magistrate judge then ordered the Prison Officials to file "special reports" addressing Marbury's generalized-risk allegations.[2] After the Prison Officials filed reports denying the charges,

---

[2] Federal district courts in Alabama often use a "special report" proceeding to process § 1983 claims brought by pro se prisoners. *Chapman v. Dunn*, 129 F.4th 1307, 1320 (11th Cir. 2025) (Jordan, J., concurring). In a special-report proceeding, "soon after a *pro se* prisoner files a complaint under 42 U.S.C. § 1983," the magistrate judge orders the defendant to submit a report concerning the plaintiff's allegations, which may be accompanied by affidavits or other evidence. *Id.* Once the report is submitted, the magistrate judge or district court can convert it sua sponte "into a motion for summary judgment by the defendant." *Id.*

the magistrate judge construed them as motions for summary judgment and gave Marbury 21 days to respond.

Marbury filed several responses opposing summary judgment and moved for leave to conduct additional discovery.[3] He requested all incident reports regarding inmate-on-inmate assaults involving the use of weapons and all administrative security policies at St. Clair. *See* Mot. for Additional Disc. at 1, Dkt. No. 51. For the years 2010 to 2018, he also requested all incident reports regarding inmate-on-inmate assaults "involving the use of weapons that resulted in injury[] or death at St. Clair," as well as "all employee[] complaints regarding security hazards within St. Clair." *Id.*

The magistrate judge recommended that the district court (1) deny Marbury's motion for additional discovery and (2) grant the Prison Officials' motions for summary judgment on the ground that he had failed to show a substantial risk of serious harm. Finding Marbury's discovery requests "overbroad" and unlikely to "present facts essential to opposing the [Prison Officials'] motion for summary judgment," the magistrate judge doubted that the information Marbury sought was relevant. R&R, Jan. 27, 2022, at 12, Dkt. No. 62 (citation modified). Moreover, the magistrate judge

---

[3] Marbury initially filed a First Request for Production and Inspection of Documents, but the magistrate judge's "Order for Special Report expressly instructed the parties that, other than initial disclosures, no additional discovery would be allowed absent leave of court." R&R, Jan. 27, 2022, at 11 n.9, Dkt. No. 62. Accordingly, on the same day, Marbury filed a motion for leave to conduct additional discovery.

reasoned, "[e]ven if the information ha[d] some relevance, Marbury ha[d] not demonstrated how denial of his request would result in 'substantial harm' to his case." *Id.* Over Marbury's objections, the district court accepted the magistrate judge's recommendation and dismissed Marbury's claims with prejudice.

Marbury appealed the dismissal, and this Court vacated the district court's judgment, holding that Marbury was entitled to *some* discovery. *See Marbury v. Warden*, No. 22-10916, 2022 WL 17175549, at *4 (11th Cir. Nov. 23, 2022) (per curiam) (*Marbury II*). We explained that despite Marbury's "overbroad" discovery requests,

> the district court abused its discretion by denying Marbury's request outright instead of limiting the scope of the discovery to avoid subjecting the Prison Officials to unnecessary or burdensome discovery, such as by limiting discovery of these documents to only the previous year or the previous few years.

*Id.* at *3.

We disagreed with the district court that Marbury's discovery requests were "irrelevant" because "evidence regarding violence in the prison more generally was the exact kind of information this Court ha[d] said would be necessary to sustain his claim" in *Marbury I*. *Id.* Moreover, we observed that the magistrate judge's denial of discovery prevented Marbury from accessing information that would have allowed him to respond to the Prison Officials' summary-judgment motion because, as a pro se prisoner,

he simply "would not have access to this information without discovery." *Id.*

We therefore remanded the case to the district court, where the magistrate judge ordered Marbury to file a renewed motion for leave to conduct additional discovery. When Marbury did so, the magistrate judge granted his renewed motion in part and denied it in part. The magistrate judge ordered the Prison Officials to supplement their special reports with their responses to Marbury's discovery requests and allowed them to amend their reports. The Prison Officials duly produced a spreadsheet reflecting that there had been 112 inmate-on-inmate assaults at St. Clair in 2016 and 84 such assaults in 2017, along with incident reports corresponding to each attack.

The magistrate judge again construed the special reports as motions for summary judgment. And once again, he recommended that the district court grant summary judgment for the Prison Officials on the ground that Marbury had failed to show he faced a substantial risk of serious harm. The magistrate judge so recommended for two principal reasons.

First, though the documents produced by the Prison Officials showed that "inmate-on-inmate assaults occurred at St. Clair, with some resulting in serious injury which required outside medical attention, and two deaths," the magistrate judge believed that Marbury hadn't "put these numbers into context" as required by *Marbury I*—in particular, by "taking into consideration the number of inmates housed at St. Clair." R&R, Aug. 12, 2024, at 10, Dkt.

No. 87. Nor did Marbury show, the magistrate judge continued, that "an excessive number of the assaults" occurred in the cell block where he was housed, as L/M Block statistics revealed only 23 assaults, 11.5% of the roughly 200 that occurred at the prison. *Id.* at 10–11.

Second, the magistrate judge found it problematic that Marbury had failed to provide "factual support" for his assertion that inmates changed their cells without authorization—details such as "when these unauthorized cell changes occurred, the identity of the inmates involved, which cells were involved, or whether these unauthorized cell changes contributed in any way to the assault against him on January 9, 2018." *Id.* at 11.

The magistrate judge concluded from what he perceived to be the lack of context and factual support that Marbury had failed to establish a genuine dispute of material fact as to whether a generalized risk of violence pervaded St. Clair—and, therefore, whether he faced a substantial risk of serious harm. *Id.* The magistrate judge thus recommended that the district court grant summary judgment to the Prison Officials. *Id.* at 12. And over Marbury's objections, the district court again adopted the magistrate judge's recommendation and dismissed Marbury's claims with prejudice.

Marbury filed this appeal, marking his third trip—and this particular case's second trip—to this Court.

## II

A prison official's "deliberate[] indifferen[ce] to a substantial risk of serious harm to an inmate who suffers injury" gives rise to an Eighth Amendment violation. *Lane v. Philbin*, 835 F.3d 1302, 1307 (11th Cir. 2016). Though "[n]ot every injury suffered by one inmate at the hands of another . . . translates into a constitutional liability for prison officials responsible for the victim's safety," "prison officials must take reasonable measures to guarantee the safety of the inmates." *Marbury I*, 936 F.3d at 1233 (citation modified). "To establish a § 1983 claim for deliberate indifference, a plaintiff must show '(1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to that risk; and (3) causation.'" *Id.* (quoting *Lane*, 835 F.3d at 1307).

Because the district court dismissed Marbury's deliberate-indifference claim at step one, so to speak—*i.e.*, on the ground that Marbury hadn't shown a "substantial risk of serious harm"—we address here only that threshold element. To show a substantial risk of serious harm based on a "generalized risk of violence"—as Marbury seeks to do—a plaintiff must meet a high bar. In particular, he must show that the prison's conditions were objectively "extreme and posed an unreasonable risk of serious injury to his future health or safety." *Id.* (quoting *Lane*, 835 F.3d at 1307). And to make that showing with respect to "serious inmate-on-inmate violence," he must demonstrate that such violence is "the norm or something close to it," such as "confinement in a prison where violence and terror reign." *Id.* at 1234 (quoting *Purcell ex rel. Estate of Morgan v. Toombs Cnty.*, 400 F.3d 1313, 1320, 1322 (11th Cir. 2005)). Neither

"a generalized awareness of risk" nor the mere presence of "occasional, isolated attacks by one prisoner on another" will suffice. *Id.* (citation modified).

Marbury contends that he has shown at least a genuine dispute of material fact as to whether he faced a substantial risk of serious harm at St. Clair. He points, of course, to the Prison Officials' discovery responses, which reflect that there were 112 inmate-on-inmate assaults at the prison in 2016 and 84 such assaults in 2017—an average of about nine and seven per month, respectively, or about one every three or four days. Marbury also insists, importantly, that he has satisfied *Marbury I*'s guidelines for establishing a generalized risk of violence because (1) the prison records obtained in discovery provide sufficient "context" for his allegations and (2) his sworn pro se pleadings identify "specific features" that make St. Clair especially violent. *Id.* ("context"); *id.* at 1235 ("specific features").

For the reasons that follow, we agree that Marbury has provided enough to survive summary judgment on the substantial-risk issue.[4]

---

[4] "We review the district court's grant of summary judgment de novo, viewing all the evidence and drawing all reasonable inferences in the light most favorable to the non-moving party." *Marbury I*, 936 F.3d at 1232 (citation modified). "Summary judgment is warranted where the evidence in the record presents no genuine issue of material fact and compels judgment as a matter of law in favor of the moving party." *Id.* (citation modified). "Where, as here, an inmate proceeded pro se in the district court, his summary judgment pleadings

## A

As an initial matter, we hold that Marbury has provided the requisite "context" to support his statistical allegations. In *Marbury I*, we emphasized that although we had been presented with raw data regarding the prevalence of inmate-on-inmate violence, we lacked any evidence that would allow us to put those data in "context." *Id*. at 1234. In particular, we emphasized that we knew nothing about "the total prison population," "the sections of the prison in which the attacks occurred," or "period of time [during which] these incidents occurred." *Id*. Here, we have enough of that kind of evidence.

For starters, we know St. Clair's "total inmate population" during the years in question. Publicly available government records show that St. Clair housed 977 inmates as of December 2016 and 1,016 inmates as of December 2017—the two years leading up to the attack on Marbury in January 2018. *See Statistical Reports*, Ala. Dep't of Corrs., https://doc.alabama.gov/StatReports.aspx.[5]

---

are construed liberally and 'specific facts' alleged in his sworn complaint can suffice to generate a genuine dispute of fact." *Id*.

[5] Because St. Clair's inmate population is "not subject to reasonable dispute," we may take judicial notice of it. Fed. R. Evid. 201. Indeed, we've previously taken judicial notice of similar facts published by state prison authorities. *See, e.g.*, *Dimanche v. Brown*, 783 F.3d 1204, 1213 n.1 (11th Cir. 2015) (taking judicial notice of the numbers of colonels and prisons in Florida's Department of Corrections as published in the annual statistics report on the state's Department of Corrections' website); *Terrebonne v. Blackburn*, 646 F.2d 997, 1000 n.4 (5th Cir. June 1981) (taking judicial notice of Louisiana's Board of Pardons' pardon

24-13513                Opinion of the Court                    15

Given the number of inmate-on-inmate assaults that occurred during those years—again, 112 in 2016 and 84 in 2017—we can deduce an average of one assault for every 10 inmates during the years in question.  Those numbers dwarf the assault statistics we deemed insufficient in *Purcell*, 400 F.3d at 1322 n.21, and *Harrison v. Culliver*, 746 F.3d 1288, 1299–1300 (11th Cir. 2014), and we have little trouble concluding that they create a genuine dispute of material fact whether "violence was the norm or something close to it" at St. Clair.  *Marbury I*, 936 F.3d at 1234 (quoting *Purcell*, 400 F.3d at 1322).[6]

Moreover, the incident reports disclosed in discovery contain the other kinds of evidence that we said would help to contextualize Marbury's statistical allegations—namely, "the sections of the prison" in which the incidents occurred and "over what period

---

or commutation rate as published in the state's department of corrections' annual statistical reports).  And judicial notice is particularly appropriate here because, as we observed in *Marbury II*, pro se prisoners like Marbury have limited access to even publicly available information.  *See Marbury II*, 2022 WL 17175549, at *3.

[6] In *Purcell*, we held that "two to three pretty serious inmate fights over a period of nine months" in a jail that housed more than 100 inmates didn't establish "frequent and pervasive" instances of "serious inmate-on-inmate violence."  400 F.3d at 1322 n.21.  Controlling for the prison population, St. Clair has at least two to four times as many violent incidents as in *Purcell*.  In *Harrison*, we held that 33 incidents involving weapons over a period of 32 months at a prison that housed between 830 and 990 inmates was insufficient to establish a substantial risk of serious harm.  746 F.3d at 1299–1300.  Controlling for the prison population, St. Clair had five to nine times as many violent incidents in the relevant period as the prison in *Harrison*.

of time." *Id.* In every respect, therefore, the record in this case is far more extensive than that in *Marbury I*, in which Marbury's lone relevant allegation—that he had witnessed 15 stabbings—was unsupported by any contextual evidence at all. *Id.*

The Prison Officials offer two responses to Marbury's contextualized statistics. First, they emphasize that Marbury was an unusual inmate in that he was part of a contingent of inmates who were temporarily transferred from another prison and was housed with them in the "L/M Block" at St. Clair. Accordingly, the Prison Officials assert, we should consider only the statistics pertinent to the L/M Block, rather than those about the total prison population. And, their argument goes, the L/M Block's inmate-assault statistics more closely resemble those that we rejected in *Purcell* and *Harrison*. But in the particular circumstances of this case, and based on the record as it exists before us, it's not at all clear that being a transfer in the L/M Block exposes an inmate to less violence than being housed anywhere else. Assuming Marbury's sworn allegations to be true—which we must at this stage—St. Clair inmates roamed unauthorized throughout the prison, weapons were prevalent, and guards were often absent. Am. Compl. at 11–12, Dkt. No. 9. In those circumstances, it stands to reason that the conditions existing within St. Clair generally would pervade the entire facility and infect the L/M Block, and that the prison-wide statistics would thus have a bearing on the risks faced by L/M-Block inmates.

Second, the Prison Officials assert that statistics regarding inmate-on-inmate assaults in 2016 aren't relevant because the present

24-13513　　　　　　Opinion of the Court　　　　　　　17

case is about the conditions that Marbury faced when he returned to St. Clair in 2017. Their argument is misguided for two reasons. For one, even if we were to ignore the 2016 statistics, that would leave 2017, in which there were 84 inmate-on-inmate assaults—or, again, roughly seven per month and one every four days. For another, we rejected so myopic a focus in *Marbury II*. There, we held that the district court had erred in refusing as irrelevant Marbury's discovery requests for incident reports on inmate-on-inmate assaults from 2010 to 2018, and we emphasized that "evidence regarding violence in the prison *more generally* was the exact kind of information this Court has said would be necessary to sustain [Marbury's] claim." *Marbury II*, 2022 WL 17175549, at *3 (emphasis added). We reasoned that the district court should have instead "limit[ed] discovery . . . to only the previous year *or the previous few years*." *Id.* (emphasis added). And on remand, the district court appropriately allowed discovery of those records for the years 2016 and 2017. *Cf. Hale v. Tallapoosa Cnty.*, 50 F.3d 1579, 1583 (11th Cir. 1995) (looking to the prevalence of inmate-on-inmate violence during the two years preceding the attack in question).

★　★　★

For these reasons, we hold that when placed in the appropriate "context," the statistics that Marbury has presented—reflecting almost 200 inmate-on-inmate assaults during the two years leading up to the attack on him—establish a genuine factual dispute as to whether he faced a substantial risk of serious harm at St. Clair.

**B**

In addition to evidence that allows us to evaluate Marbury's statistical evidence in "context," Marbury's sworn complaint and accompanying affidavit point to "specific features" of St. Clair that exacerbate the risks of inmate-on-inmate violence and that, accordingly, reflect a genuine dispute of material fact as to whether he faced a substantial risk of serious harm.

As relevant here, Marbury's pro se pleadings contained the following sworn allegations:

- Marbury "witness[ed] several stabbing incidents," including "one where a supervisor took a knife only to give it back to the inmate he took it from to go stab[] the inmate he just got into it with." Am. Compl. at 11, Dkt. No. 9.

- Warden Specks suggested that Marbury "go get a knife or pay the Crips, I.G.Ds, [or] Blood [gang] for some protection." *Id.*

- "[A]t times the cubicle in [the] Block would be [un]occupied with no officers on post for hours." *Id.*

- "[T]here were inmates living in cells that w[ere] not assigned to these cells by the administration at St. Clair. These inmates took the initiati[ve] to move without . . . authorization." *Id.* at 12.

On appeal, the Prison Officials have identified what they take to be several problems with Marbury's allegations. We'll address their objections in turn.

First, the Prison Officials assert that Marbury failed to point to the right *kind* of "specific features"—"understaffing," "over-crowding," lack of a "classification or segregation system," or an "inability to monitor [the] Block." Supp. Br. of Appellees at 19. But the requirement that an inmate point to "specific features" that make a prison particularly dangerous isn't a rigid box-checking exercise; there is no mandatory catalogue or hierarchy. Our en banc decision in *Marsh v. Butler County*, 268 F.3d 1014 (11th Cir. 2001) (en banc), *abrogated on other grounds by Bell Atl. Corp. v. Twombly*, 550 U.S. 554 (2007), makes that clear. There, we held that, if true, the plaintiffs' qualitative allegations regarding what *Marbury I* would later call "specific features"—namely, that the prison's locks didn't work, that inmates had ready access to weapons, and that no video or audio surveillance system was in place—were sufficient to show a substantial risk of serious harm. *Id.* at 1028. We emphasized that the plaintiffs there weren't required to provide, in addition, quantitative evidence that the prison had a "history of inmate assaults with serious injuries." *Id.* at 1034. Marbury has offered more—he has *both* shown a history of inmate violence *and* pointed to several features that make St. Clair particularly violent.

Second, the Prison Officials argue that Marbury's "limited evidence" fails to sufficiently support his allegations of "unauthorized cell movements and weapons availability." Supp. Br. of Appellees at 19. In short, we disagree. With respect to inmates moving around the facility, the Prison Officials complain that Marbury didn't provide evidence of "when these unauthorized cell changes

occurred, the identity of the inmates involved, which cells were involved, or whether these unauthorized cell changes contributed in any way to the assault against him." *Id.* at 20 (quoting R&R, Aug. 12, 2024, at 11, Dkt. No. 87). We see two problems. One, Marbury needn't go into such detail: This is an ordinary civil case, not a fraud claim of the sort subject to heightened who-where-when pleading standards. *See* Fed. R. Civ. P. 9(b). Moreover, and in any event, Marbury was proceeding pro se in the district court, so we must accept his sworn allegations as true at summary judgment and construe his pleadings liberally. *Marbury I*, 936 F.3d at 1232. Two, Marbury's allegation *is* supported by the incident reports in the record, several of which show that an inmate assigned to one cell block was involved in an assault in a different cell block. *See, e.g.*, Resp. to Disc. Reqs. at 207, Dkt. No. 84–1; *id.* at 239; *id.* at 285 (reporting that an inmate involved in an incident "was down in H-Dorm to miss all the dangers" of his assigned cell block).[7]

The Prison Officials also downplay Marbury's allegations regarding the ready availability of weapons inside the prison. They contend that the "few stabbings" in the record and Specks's advice that Marbury should "get a knife" to protect himself aren't sufficient to "give rise to a reasonable inference of *widespread* weapons availability." Supp. Br. of Appellees at 21 (emphasis in original).

---

[7] *Cf. Boykins*, 696 F. Supp. 3d at 1069–71 (noting Warden Estes's testimony that St. Clair's policy for keeping track of inmate movement was unenforced and that "probably more than 50 percent" of incidents at the prison were "caused by an inmate who was in a place they weren't supposed to be").

But there's more.  Marbury also alleged that he personally witnessed several stabbings and that he saw a supervisor return a knife to an inmate after temporarily confiscating it.  And importantly, the record supports his allegations:  The spreadsheet of recorded incidents includes several references to "inmate made kni[ves]," "handmade kni[ves]," "ice pick[s]," "box cutter type weapon[s]," as well as to a "knife type weapon," "claw hammer," "club weapon," "broken broom sticks"—all of which at the very least indicate that more than just a "few stabbings" took place.  *See* Resp. to Disc. Reqs. at 1–147, Dkt. No. 84–1.

★   ★   ★

For these reasons, we hold that Marbury has adequately pointed to "specific features" of St. Clair that make the prison particularly dangerous and that, in connection with his statistical evidence, give rise to a genuine dispute as to whether he faced a substantial risk of serious harm.

## III

The Prison Officials urge us to affirm on either of alternative grounds: (1) because Marbury failed to make out the second and third prongs of his three-part deliberate-indifference claim; or (2) because they are entitled to qualified immunity.  We decline to do so.  The district court didn't address those issues, and neither will we.  "We are wary of diving head-first into claims that the district court hasn't yet considered." *Callahan v. U.S. Dep't of Health & Hum. Servs.*, 939 F.3d 1251, 1265 (11th Cir. 2019).  "We are, after all, a court of review, not a court of first view." *Id.* at 1266; *cf. Copeland*

*v. Ga. Dep't of Corrs.*, 97 F.4th 766, 780–81 (11th Cir. 2024) (declining to address in the first instance one element of a Title VII claim that was unaddressed by the district court).  The district court may of course address those and any other remaining issues on remand.

## IV

For the foregoing reasons, we hold that Marbury has shown that there is a genuine dispute of material fact as to whether he faced a "substantial risk of serious harm" of the sort that implicates the Eighth Amendment.  Accordingly, we **VACATE** the district court's decision granting summary judgment to the Prison Officials and **REMAND** for further proceedings consistent with this opinion.